Hear ye, hear ye, hear ye. The United States Code of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. All right, good morning, counsel. Welcome to the Fifth Circuit via Zoom, not quite New Orleans, but appreciate your working with our tech staff to make this possible this morning. Our first case is United States v. Williams, and we'll first hear from Mr. Williams, counsel, whenever you're ready. Good morning. May it please the court, my name is Scott Martin. I represent Stuart Williams in this appeal of the order of restitution in his case. Mr. Williams was convicted of wire fraud in order to pay over $2 million in restitution to the victim, Jones Alto Colorado Ranch, with whom Williams had agreed to acquire cattle and sell to another ranch called Wyatt Ranches of Texas. The scheme centered around Williams creation of a fake purchase order for cattle in September of 2016, which if real would have been the fourth legitimate deal that Williams had arranged between the Jones and Wyatt ranches. In this appeal, Mr. Williams argues that the government failed to meet its burden of proving the amount of Jones is limited to actual loss directly and proximately caused by the offense of conviction. Now, because a subject defense involved a scheme, restitution can be awarded to any person who is directly harmed by Williams's course of criminal conduct. Importantly, a court must measure actual loss based only on the pecuniary harm suffered by the victim, and every dollar must be supported by reported by the victims, the court must determine by preponderance of the evidence whether the victim impact statements actually support the quantum of an award of restitution. And even if the amounts from the victim impact statement are incorporated directly into the PSR, as happened here, this district court can adopt the precise amount from the PSR only if those amounts had an adequate evidentiary basis and remained unrebutted by the defendants. Here, the problem is that the court relied on a victim impact statement from Jones Ranch, which in a table at ROA 680, which was incorporated into the PSR, and that table is at ROA 505 and 506. And that table listed all the payments that Jones Ranch made to Williams as reimbursement for cattle purchases and related expenses and payments that he caused Jones Ranch to make directly to other cattle auctions without identifying and separating out payments that were used by Williams to complete Wyatt Ranch's legitimate $1.7 million purchase order from March of 2016, which is referred to as the third deal, for which Jones Ranch had actually been paid up front and in full by Wyatt Ranch. We know that Mr. Williams was purchasing and delivering cattle to Wyatt Ranch between March and September of 2016. And here's why. Paragraph 16 and 17 of the PSR explain that for the third order of cattle, which is the one from March of 2016, there were problems with late deliveries of cattle, problems with cattle that were sick or barren or the wrong color. So Wyatt Ranch was sending some of the shipments back and they created amended purchase orders in May and August of 2016 and threatened to sue Jones Ranch. Paragraph 18 of the PSR says that the third purchase order was not completed until September 12, 2016. On this date, Wyatt went to Jones Ranch and was given additional cattle worth approximately $30,000. The additional cattle did not make Wyatt Ranch whole, but they were done with Williams. Some good examples of expenses that include the more than $400,000 in payments that Williams caused Jones Ranch to make by check or wire transfer in April and July of 2016 to Jordan Cattle Auction for the purchase of cattle. And you can see that those are available at ROA. The check is available at ROA 667. It's a check for $85,200 that Jones Ranch made out to Jordan Cattle Auction with a subject line cattle order in which the PSR says Williams caused Jones Ranch to pay. That check's dated May 18, 2016. There's also an invoice dated July 30, 2016 at ROA 675, which indicates a payment of $369,175 to Jordan Cattle Auction for which the PSR says Williams caused Jones Ranch to wire from their IBC bank account to Jordan Cattle Auction's national bank account on September 7, 2016. So Mr. Martin, I see those payments. Those are some of the larger amounts. So apparently some cattle were purchased by your client at these auctions. Are you saying that some of those cattle did make their way to Jones Ranch? The government actually acknowledged that in its sentencing. It said that it expected that some of those cows obtained for the fake fourth sale went to the $1.7 million deal that the victims believe had been finalized in April of 2016. That's at ROA 301. The government also acknowledged that Williams is still trying to satisfy Brad Wyatt of Wyatt Ranch up until the date of September 16, even though Jones Ranch, who he was working for, didn't know about it. That's at ROA 282. Our argument, Your Honor, is that the price of cattle that Williams purchased and delivered in relation to this third deal, plus any related expenses for feeding, medicating, transporting, should have been clearly identified by the agent overseeing the investigation and deducted from the loss total. The court's opinion in Antonucci, which I've cited in my brief, is instructive. In that case, the defendant was convicted of embezzling money from his employer, and an FBI analyst prepared a chart that included payments the defendant made with the employer's debit card. And these were deemed losses simply because they were procedurally improper due to the fact they were in violation of the employer's. Mr. Varden, what do you say the correct number is? Well, Your Honor, the number is somewhere between $387,000, which are the last three entries on this table at 505 and 506. And we've conceded that that amount is proper for actual loss. It's somewhere between that number and the $2 million of restitution that was awarded. And our argument is the government needs to prove what that number is, because it's their burden. The government never met its initial burden of establishing the loss by preponderance of the evidence. That's our position. Why isn't this like all these health care fraud cases? I mean, that's where restitution is usually an issue when it comes to us, is in these health care fraud cases where the government comes in and says, look, Medicare was billed $10 million, and there were all these false claims to Medicare. And then I think it shifts to the defendant to say, oh, but a couple million were actually services provided, and it gets that credit. Why isn't this like, because it does seem, it seems pretty clear that these were expenses Jones Ranch incurred. And the issue is, did they get anything back at some point in this scheme that there should be some reduction for? And it seems to me like we just don't know all the facts. And so the question, I mean, you're saying that that goes to the government, that problem, that's sort of the thrust of the question, I think. Who has to bear the burden of that uncertainty? That's correct, Judge Costa. In this case, it's different from those medical, you see that, as you say, you see it frequently in those medical insurance fraud cases. But unlike in those cases, this is a case where the person doing the fraudulent billing is a separate entity. In this case, Williams was really part of the same organization. He was a ranch foreman for Jones Ranch before he entered in this agreement to acquire cattle and sell it to Wyatt Ranches. And he was also the son-in-law of the owners and operators of Jones Ranch. So it's a little different from those medical insurance cases that are discussed in Sharma and other cases, Ricard, other cases that are cited in the briefs. And also at sentencing, defense counsel had explained with that objection that Jones Ranch would have had all the documents, all the same documents as Mr. Williams, showing where the cattle went or what lands were rented and the veterinary expenses and such things. And our position is that since the government is the one seeking restitution, this should be treated like an embezzlement, any other embezzlement case rather than one of those insurance fraud cases. And that the agent who oversaw the investigation should have provided his own or her own affidavit or chart detailing the amount of actual loss. And you see that happening in other cases like Berry and Antonucci, which I've said in our briefs. And those cases are unlike this one because here we have the government essentially just relying on the table that was provided by Jones Ranch without actually having an affidavit or any other evidence from the agent saying I've gone through these expenses and I'm telling you that these ones are actual loss. These cause pecuniary harm to Jones Ranch because they were not part of this third legitimate deal versus others that were. You know, the government at the restitution hearing, you know, admitted that it's Roas 349 said, truth be told, we don't know where a lot of these cows went because cows are difficult to track. Well, that may be true, but they didn't say impossible to track. And the government is the one seeking restitution. It should be their burden to send their agents in the field and figure out what happened to these cows. If they can't figure out what happened, then there should be no order of restitution for those losses. And it should be limited to the $387,000 worth that we have already acknowledged should be, uh, should be his actual loss. What do you think? What do you say this court should do? Well, our our position, which would be that this court should order that the government did not meet its burden and that the figure should be $387,000. That's a lower number. The lower number. If you were vacated in return, could this loss be? Is there a process by which a truer number could be captured? I think that if we went back to the district court, then the government could have its agents do the investigation. We could have a hearing and determine which ones of which losses which numbers here from this table actually cause pecuniary harm to Jones hearing. That's that's the process. But how would you? How would you it is either they didn't do their job or they couldn't. They really couldn't reconstruct their losses. Well, your honor, the government said that the cows are difficult to track, but they didn't say impossible. And from what I can tell, they haven't really put forth much effort in determining what would the losses. Uh, our position is the government's burden, and, um, they need to do that if they want to support every dollar of the restitution award with record evidence, which they're required to do. Um, and that's our position, your honor. Unless there any other questions, I'll reserve my time for rebuttal. All right. Thank you, Mr Martin. We'll not hear from the government. Thank you. May it please the court. Andrew Sand for the United States of America. Two quick points. Um, first, there's no evidence connecting the actual loss losses here to the third legitimate cattle deal or any legitimate cattle deal. Um, second, um, my colleague talks about burden shifting. So the government met its initial burden, which was simply to prove the actual loss amount by a preponderance of the evidence, which it did using the PSR and victim impact statements. Um, he argues that he's not the best party to provide rebuttal evidence, but that argument rings hollow. Um, he was the broker for Jones Ranch seeking reimbursement for obtaining cows, fertilizer, veterinarian services. If he had actually used this money as, as he said he did, he would certainly be the best party to provide evidence to that effect. And he failed to do so at sentencing. At sentencing, the district court properly determined that Williams owed $2,066,525 in restitution for Jones Ranch's actual loss. This amount was established by the PSR and victim impact statements, which I already mentioned, which Williams failed to rebut. The district court also explicitly found that his fraudulent scheme began in early 2016, not September 2016. Now on appeal, Williams asked this court to second guess the district court's careful ruling, which is amply supported by the record. At sentencing, the district court found that the government proved Jones Ranch suffered an actual loss for all the disputed items. The district court carefully reviewed the victim's actual losses item by item and even rejected two of them. The first from 2015, because it fell outside the temporal scope of the fraud. And the second from February, 2016, because Jones Ranch actually received a feed mixer. All the other items. However, the district court properly found constituted an actual loss suffered by Jones Ranch. Well, let me ask, um, it does seem like there's not a complete picture of everything that happened here. And, and that's why there's a lot of talk about, you know, who bears the burden of that uncertainty, but just take this September, 2016, Jones Ranch pays $370,000 to the cattle auction. So someone got cows from that cattle auction house. Is the government saying Williams then sold those to some other people and pocketed all the money or is it, or is it conceding that Jones Ranch did get some of those cows or does it just, there's just no one knows what's, what does the evidence show? Your honor, the evidence shows that there's, there's no, the evidence shows that Jones Ranch actually suffered an actual loss for that amount. Um, it never received anything in return. There's no evidence to show that, um, they've used, they've offered the victim impact statements, which, um, as part of that, the victims swore and signed, signed and swore to that they suffered an actual loss, uh, to that amount. I guess part of the problem in having dealt with victims, I mean, they obviously know that those are all expenses, no doubt, all that money went out the door, you know, lost calculation under restitution. It's sort of, you know, it's something lawyers can struggle to figure out. Um, I mean, did they affirmatively say they never received any cows as part of that transaction? Yes, your honor. They, they never received anything in return for that, for that transaction that, that is the government's position, um, impact statement or based on other, other evidence as well. Based on their, their mainly on their victim impact statement. Yes, your honor. Um, and, and just kind of to, to reiterate what I started off by saying, you know, Jones ranch, this is, this goes to the burden shifting part, Jones ranch, sorry, uh, Williams, if he had actually done what he had said he had done, you know, if he had actually went and gotten the cows on behalf of Jones ranch and delivered them, he certainly would be the best party, um, to provide evidence to that effect. You know, he, he provided no such kind of delivery receipt or even an email confirming that he, he actually delivered the cows or, you know, obtain fertilizer or veterinarian services. But it would also seem to me if he sold it to other folks and pocketed the money, even though Jones ranch paid for the cows, you know, that would probably show up in his bank accounts. I know in these investigations, you scour the financial records, um, uh, you know, of the defendant. And it doesn't seem like it doesn't seem like we have anything like that, right. Showing that Williams got money from other folks tied to these particular purchases. The record's a little bit unclear on that, on that front. In reaching its, uh, restitution ruling, uh, the, the district court as, as discussed properly relied upon the PSR, um, namely, uh, paragraphs 19 through 22 and paragraphs 28 through 38, which it found had sufficient indicia of reliability. Um, it also properly relied upon the victim impact statements, um, which are found at ROA 657 through 682. Um, and, and we'd like to note that these victim impact statements use the same standardized forms upheld by this court in dial and in dial that the, the court discuss how the victim impact statements included a description of the, um, underlying criminal activity included supporting documentation and were signed and sworn to by the victims as constituting an actual loss and thus were reliable. Um, so they, they, the same victim impact statement forms in dial were used in this case. Um, moreover, the victim impact statement forms in this case, they included falsified cattle invoices, ranch leases, and purchase orders from 2016. Williams pled guilty to four counts of wire fraud for sending these exact documents over email. Thus he's admitting that many, he admitted as part of his plea agreement that, um, many of the victim impact statement, um, underlying documents were actually fraudulent. Um, and, and we'd like to note that, um, in his plea agreement, he, he pled guilty to, um, wire fraud for sending these emails, which occurred in September. The emails were sent in September, 2016, but the fraudulent, um, documents, which, which are part of the victim impact statement forms. Those are from prior to September, 2016. Those are from, uh, March, uh, April, May, and July of 2016. So, you know, that, that underlines his, um, actual guilty plea. Additionally, the district court made two key findings. First, it found quote, no evidence that the disputed payments here were part of the third legitimate cattle sale or any legitimate cattle sale. Um, second, it expressly found that Williams's fraud began in early 2016, not September, 2016. These are factual findings given deference by this court and reviewed only for clear error. Moreover, Williams's reliance on this court's unpublished decision in Antonucci is misplaced. Antonucci involved a healthcare executive who illegally used a company's debit card for personal expenses. At sentencing, the FBI included all of the debit charges in the restitution amount because it violated the company's policy without separating out the legitimate business expenses from the illegitimate personal expenses. The court reversed holding that this loss methodology was flawed because it did not reflect the victim's actual loss amount. By contrast here, there was no error in the loss methodology. The district court carefully ensured that there were no legitimate expenses included in the restitution amount, which was well supported by the PSR and victim impact statements. Last, and I've already kind of touched on this, Williams's burden shifting arguments all fail. First, the government met its initial burden, which was simply to prove the actual loss amount by a preponderance of the evidence, which it did using the PSR and victim impact statements. Second, and I mentioned this, Williams, he argues that he's not the best party to provide rebuttal evidence, but this argument rings hollow. He's the broker on behalf of Jones Ranch, and he's seeking reimbursement for obtaining cows, fertilizer, veterinarian services. You know, if he had actually used that money, as he said he did, he would certainly be the best party to provide evidence to that effect, and he failed to do so at sentencing. Third, Williams argues that the government must show both the fraudulent payments and the legitimate payments, but that argument fails. As the district court correctly found, that is not the extent of the government's burden, which is simply to prove the actual loss amount by a preponderance of the evidence, which it did using the PSR and victim impact statements. In sum, the district court did not abuse its discretion in determining the restitution amount. All right. Pending any further... Yes, Your Honor. You can wrap up. Pending any further questions, the government respectfully requests that this court affirm the district court's judgment. All right. Thank you, Mr. Sand. And now, rebuttal, Mr. Martin. I just have a few points. The government and it's... Mr. Sand has said there is no evidence connecting any capital to the third deal. Well, the government at sentencing did acknowledge that some of the cows obtained for this so-called fake fourth sale did go to the third deal that the victims believed had been finalized in 2016, and that's at row 301. Mr. Sand relies on these victim impact statements, but we know that's not enough. You don't trust these statements just because they're on a form, because I think, Judge Costa, as you alluded to, sometimes the victims aren't thinking in the same way about actual loss. They're just putting down what they paid out. They're not going through and trying to determine which were spent on legitimate expenses. And we know that it's not enough just to rely on the victim impact statements, because in Sharma, a court said that if there's a dispute about a victim impact statement, a court must still determine by preponderance of the evidence whether the victim impact statement actually supports the quantum of an award of restitution. Here, you know, the government at the restitution hearing, again, admitted that, truth be told, we don't know where a lot of these cows went because cows are difficult to track. But Mr. Sand offered no explanation for why it didn't have its agent go through these expenses and do the investigation in order to meet its initial burden, as the government has done in many other cases, including Barry and Antonucci, which were both cited in my brief. Your Honors, unless there's any further questions, I think that you understand our positions, and I will rest on my briefs. What about the government's point that why can't your client come in and say, look, I gave them 10 cows this month and 20 cows this month, and this, you know, this is where they went? If those are the facts. It's our position. It's not our burden. It's not our burden. The government did not meet its initial burden. And at sentencing, our defense counsel explained without objection that Jones Ranch does have all the same documents, all the same documents, and would have known where the lands were rented and the cows were going. So our position is that it was not our burden to do that. All right. We have, and Your Honor, we did, I'm sorry. No, go ahead. We have agreed to the $387,000, which was clearly actual loss to Jones Ranch, because those losses all occurred after the September 6th email where Mr. Williams proposed this fake fourth deal. But everything before that is all mixed. It's overlapping and mixed together, and the government just simply didn't meet its burden of separating out what went towards the legitimate third deal and what did not. All right. We have your argument, and the case is submitted. Counsel are excused. Thank you.